| | | |
|---|---|---|
| TAMMERA D. WETHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-00027-TWP-TAB |
| | ) | |
| NADIR H. AL-SHAMI, M.D.; | ) | |
| ADVANCED CORRECTIONAL | ) | |
| HEALTHCARE, INC; | ) | |
| CHRIS MICHAELSON, R.N.; | ) | |
| SHERIFF, MONTGOMERY COUNTY; | ) | |
| and MARK RUIZ, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' two separate Motions for Summary Judgment. The Court consolidates Defendants Chris Michaelson ("Michaelson") and the Sheriff of Montgomery County's ("Sheriff") motion as well as Defendants Nadir H. Al-Shami, M.D. ("Dr. Al-Shami"), Mark Ruiz, M.D. ("Dr. Ruiz"), and Advanced Correctional Healthcare, Inc.'s ("ACH") (collectively, "Defendants"), motion for summary judgment for the purposes of this Order. This dispute arises from distinct allegations by Plaintiff Tammera D. Wethington ("Wethington") against Defendants alleging violations of her constitutional rights under 42 U.S.C. § 1983 and various state law claims.

Specifically, Wethington, a prisoner incarcerated in Montgomery County Jail in Crawfordsville, Indiana, alleges that Defendants Michaelson and Sheriff, in his official capacity, acted with deliberate indifference in failing to adequately respond to Wethington's serious medical needs in violation of the Eighth Amendment. Additionally, Wethington argues that Michaelson is liable for negligence under the Indiana Tort Claims Act ("ITCA"). Wethington

further argues that Defendants Dr. Al-Shami and Dr. Ruiz are liable for medical malpractice and negligence. In countering these allegations, Michaelson and Sheriff contend that their conduct and administrative policies do not amount to deliberate indifference in violation of the Eighth Amendment. Secondly, they assert that any claims under the ITCA brought against individual government defendants are meritless because they were acting within the scope of their employment. Lastly, Defendants Dr. Al-Shami, Dr. Ruiz, and ACH argue that they did not breach Wethington's applicable standard of care; therefore, the negligence claim cannot stand. For the reasons set forth below, Defendants Michaelson and Sheriff's Motion for Summary Judgment (Dkt. 71) is **GRANTED in its entirety** and Defendants Dr. Al-Shami, Dr. Ruiz, and ACH's Motion for Summary Judgment (Dkt. 68) is **GRANTED in its entirety.**

## I.  PRELIMINARY EVIDENTIARY ISSUE

As a threshold matter, the Court acknowledges that it must address one evidentiary motion before determining the undisputed facts for purposes of summary judgment: specifically, the Motion by All Defendants to Exclude Plaintiff's Experts (Dkt. 86). In Wethington's response brief to both of Defendants' motions for summary judgment, she relied on the affidavits of two medical expert witnesses, Edward Weissman, M.D. (Dkt. 77-5) and Frances Miller, E.M.T.P. (Dkt. 77-6). However, at that time, Wethington had not disclosed these expert witnesses to all of the Defendants as required by Rule 26. *See* Fed. R. Civ. P. 26(a)(2)(A). In addition, Wethington failed to file a surreply brief pursuant to Local Rule 56.1(d) to respond to Defendants' objections to these expert witnesses' affidavits in their reply briefs. Further, Wethington's disclosure of her retained expert witnesses, filed under Supplemental Notice of Plaintiff's Rule 26 Disclosure of Experts (Dkt. 85) on September 22, 2011, was one year and one day after the Court's initial deadline to disclose expert witnesses and serve reports as required by

Rules 26(a)(2)(A) and (B). In light of Wethington's attempts to rely upon these expert witnesses' affidavits in opposing summary judgment, Defendants argue that the experts' testimonies should be excluded because they violate the Court's orders and the discovery rules. The Court agrees.

Under Rules 26(a)(2)(A) and (B), a party is required to disclose the identity of any witness the party may use at trial to present expert evidence, including a written report, if the witness is retained or employed to provide expert testimony in the case or the witness' regular duties as an employee include giving expert testimony. *Id.* Furthermore, Rule 26 requires that disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). In addition, Rule 37(c)(1) states that expert testimony may not be presented at trial if the expert's report was not disclosed to the other side within the deadline unless the party was justified in missing the deadline or the untimeliness of the disclosure was harmless. Fed. R. Civ. P. 37(c)(1).

In this case, according to the Case Management Plan, Wethington had eight months from the time this case was removed to this Court in January 2010 to September 21, 2010 to disclose retained medical expert witnesses. On September 23, 2010, Wethington notified Defendants and informed them that she did not anticipate obtaining any other medical experts beyond her two treating physicians, Dr. Paul Kwo ("Dr. Kwo") and Dr. Ravinder R. Surakanti ("Dr. Surakanti"). In addition, Wethington reaffirmed her position about her expert witnesses to Defendants in her responses to their interrogatories. Relying on these communications, Defendants did not seek to retain additional expert witnesses. However, on September 6, 2011, in her response brief, Wethington relied on the affidavits of medical experts, Dr. Weissman and Ms. Miller. Wethington did not formally disclose their written reports to Defendants pursuant to Rule

26(a)(2)(B) until September 22, 2011.  The expert witness and damages discovery deadline was set for November 21, 2011, with trial beginning on January 30, 2012.

In the Court's view, Wethington's disclosure of her medical experts and their written reports were not in compliance with Rule 26(a)(2)(A) and (B).  Because Wethington did not comply with Rule 26(a)(2)(A) and (B) and missed the deadlines outlined in the Case Management Plan, the Court must consider whether to exclude the expert testimonies under Rule 37(c)(1), "unless the failure was substantially justified or is harmless." *See Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 2002) (noting that when a party fails to timely make its expert disclosures as required under Rule 26, exclusion of expert testimony is proper unless the party shows that its violation was either justified or harmless); *see also Patel ex rel. R.P. v. Menard, Inc.*, 2011 WL 3951161, at *2 (S.D. Ind. Sept. 7, 2011) ("The burden to show that late disclosure was substantially justified or is harmless is on the party that missed the deadline.").

Wethington has not presented any justification to the Court explaining her delay in disclosing the retained medical experts and their reports, when it appears she had ample time to do so under the Case Management Plan.  Thus, the Court concludes that there is no basis for finding the late disclosures of her experts' reports would be justified or harmless. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758-59 (7th Cir. 2004) (affirming the exclusion of medical expert testimony when plaintiff failed to comply with Rule 26(a)(2)(A) and did not provide substantial justification for delaying his disclosure).  In addition, Defendants would be prejudiced if Wethington was permitted to rely on the expert testimony of Dr. Weissman and Ms. Miller, when there would be insufficient time for Defendants to depose these experts and potentially retain their own experts.  This is illustrated by the fact that Plaintiff's first disclosure of these medical experts occurred in September 2011, and the expert discovery deadline was

already set for November 21, 2011, with trial to begin on January 30, 2012. *See Patel*, 2011 WL 3951161, at *2 (excluding testimony from plaintiff's expert witnesses when he did not present any substantial justification and inclusion of expert testimony would prejudice the defendants). Because Wethington failed to give any substantial justification for failing to disclose her medical experts' reports on time, the inclusion of Dr. Weissman and Ms. Miller's expert testimony would not be harmless. Accordingly, they are excluded. Therefore, the Motion by All Defendants to Exclude Plaintiff's Experts (Dkt. 86) is **GRANTED.** Expert testimony from both Dr. Weissman and Ms. Miller is excluded and will be disregarded for purposes of this Order.

## II.    BACKGROUND

### A.    Medical Care at the Montgomery County Jail

In 2003, the Sheriff of Montgomery County entered into a contract with ACH to provide 24-hour/7 days a week on-call medical service for the inmates incarcerated at Montgomery County Jail. The ACH contract had been automatically renewed each year since 2003 for one-year terms by each elected Sheriff. In 2007, Luther Blanton was elected Sheriff of Montgomery County and decided to continue the ACH contract throughout his tenure as Sheriff.[1] ACH provided the jail with necessary medical services, including physician and nurse services, pharmaceutical services, as well as laboratory testing and diagnostic x-rays for inmates. Pursuant to the contract, ACH staffed the jail with at least one physician, who would be available on-call for the facility staff 24 hours a day, 7 days a week. In addition, the ACH physician would visit the jail once a week when sick calls were made unless there were no inmates scheduled to be seen in a given week. Along with the physician, the jail employed two nurses

---

[1] Sheriff Blanton was elected Sheriff of Montgomery County from January 1, 2007 through December 31, 2010. *See* Blanton Decl., Dkt. 73 at 1.

who would provide on-site coverage for 12 hours a day, 7 days a week. Their duties involved dispensing medication, reviewing inmate medical requests, and coordinating sick calls.

In regards to patient healthcare, the jail set forth a protocol that inmates must follow when seeking medical attention. Under the protocol, an inmate must submit a written request to be seen by an ACH physician. If a written request is submitted by an inmate requesting to be seen by a doctor, one of two things happens. First, if the written request pertains to symptoms that have not been treated by the jail physician previously, the inmate is placed on a list to be seen by the physician at sick call. On the other hand, if the written request pertains to symptoms already treated by the doctor, a nurse or medical officer on staff will call the physician to report the request. At this stage, the physician makes the final decision as to whether the inmate needs to be seen or if the request may be addressed through medication or diagnostic testing.

Pursuant to the ACH contract, ACH also provides the inmates with prescription medication that is stocked within the jail. Medications which are not in stock or needed on an emergency basis can be immediately obtained from a local pharmacy. If an inmate arrives at the jail with medicine prescribed from an outside doctor, an ACH physician must verify the prescription with the outside doctor before approving it. However, the ACH physician will not approve a narcotic medication until that physician has had time to examine the inmate in question. Additionally, any tests ordered by an ACH physician are sent to the St. Clare Hospital laboratory. Once results are obtained they are sent back to the jail and a nurse or medical officer reports them to the physician.

In late 2007 or early 2008, Michaelson, a jail officer, received training as a medical officer from one of the jail's licensed nurses. As a medical officer, Michaelson's duties involved distributing medication to the inmates, reviewing inmates' medical requests, and coordinating

sick calls. Medical officers under the jail's protocol were expected to perform functions that non-licensed medical professionals could accomplish with proper training such as, taking vital signs, ordering medication, as well as entering information into an inmate's medical administration record ("MAR"). In addition to these duties, jail officers, like Michaelson, were trained to recognize symptoms requiring urgent medical response, and to call an ACH physician or nurse for direction or call dispatch to have a rescue squad sent to the jail.

At some point in 2008, one of the two nurses employed by the jail resigned and the Sheriff sought approval from ACH to select two jail officers with EMT experience to serve as medical officers for the jail. ACH approved the Sheriff's request, and from that moment Michaelson and Ryan Gentry ("Gentry") became medical officers. However, at the time it was understood that both nurses and medical officers were not authorized to unilaterally decide to take an inmate to sick call, without the physician's approval.

**B.      Wethington's Incarceration at Montgomery County Jail**

For the most part, the material facts in this case are undisputed. However, where disputes occur, the facts and all inferences to be drawn therefrom will be presented in the light most favorable to the non-moving party, in this case the Plaintiff. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). On September 16, 2008, Wethington was jailed in the Montgomery County Jail for violating her probation. At the time of her incarceration, Wethington was on a complex medication regimen for cirrhosis of the liver, depression, anxiety, poor kidney function, and alcohol related neuropathy. The medications that she was taking included: Gabapentin, Zoloft, Buspirone, Lasix, Thiamine, Leveothyroxine, Sertraline, Spironolactone, Folic Acid, and Visatril. Michaelson, who was working on September 16, 2008, received information from Wethington's personal physician that he had prescribed her twelve

medications. After informing the current ACH physician on duty, Dr. Ruiz., he approved the dispensing of nine medications. Three of the prescriptions were not dispensed because two were out of stock, and the other, Darvon, a narcotic, was not approved because Dr. Ruiz had not examined Wethington.

Over the next week, Wethington began receiving all of her medications, except Darvon. On September 23, 2008, Dr. Ruiz also ordered a lab test to check Wethington's liver enzymes and increased her dosage of Gabapentin. Dr. Ruiz did not consult with Wethington's personal physician, Dr. Kwo, before changing her medication. A few days later, on September 27, 2008, a nurse noted that Wethington complained of "chronic pain all over" and demanded a change in her medication, including a prescription for Darvon. Upon notifying Dr. Ruiz, he ordered Darvon and decreased some of Wethington's medication.

## C.     Wethington's Sick Call Requests and Examinations

On October 2, 2008, Wethington submitted her first sick call request claiming that her knee was swollen, and Michaelson scheduled an appointment for her at the next sick call on October 7, 2008. During her first sick call visit, Dr. Ruiz noted that she had chronic liver disease, left knee pain, and anxiety. He ordered a blood test, including a basic metabolic panel, and prescribed her Prednisone, while increasing her Visatril prescription. The jail received her lab results tests back on October 9, 2008, and Dr. Ruiz reviewed them on October 14, 2008. On October 26, 2008, Wethington submitted another sick call request to Michaelson, simply writing the word "swollen" on her request form. Michaelson set up a meeting with Dr. Ruiz on October 28, 2008, at which time Dr. Ruiz discontinued Prednisone, while increasing her Lasix due to the swelling in her legs. He also ordered a thyroid check, a comprehensive metabolic panel, and monitoring of her blood pressure and pulse. However, there is no evidence to suggest that

Michaelson or any other medical officer monitored Wethington's blood pressure or pulse as ordered by Dr. Ruiz.

On November 1, 2008, Wethington submitted another sick call request, in which she complained of pain in her back, liver, and left knee. She also noted that she suffered kidney and liver failure in that past five years. However, on November 3, 2008, Wethington was visited by Dr. Al-Shami and not Dr. Ruiz because he was unavailable for the next two weeks. During this sick call, Dr. Al-Shami reviewed her blood test results from October 7 and October 28, 2008, which appeared to be normal. At the end of the examination, he ordered an increase in her dosage of Lasix to reduce the swelling in her legs. However, a week later on November 10, 2008, Dr. Al-Shami visited Wethington again and added two additional medications, Digoxin and Lisinopril, to her regimen because he was concerned about possible congestive heart failure and her continued leg swelling.

Between November 10 and November 21, 2008, no one within the jail system, including medical officers or nurses, contacted either Dr. Ruiz or Dr. Al-Shami to update them on Wethington's progress, even though she submitted a sick call request on November 13, 2008. It is not entirely clear from the record why Michaelson or Gentry failed to contact either of the ACH physicians. Because Dr. Ruiz was not contacted to see anyone for sick call during the week of November 17, 2008, he did not visit the jail that week. Additionally, the record is unclear as to the specific medical condition of Wethington during that twelve day period.[2] Michaelson stated that during the twelve day period in which Wethington was not seen by a physician, he "[did] not recall anything unusual about Wethington's condition" when he dispensed her medications on those days.

_____

[2] The record does contain the lab results from a blood test analyzed on November 11, 2008, one day after Dr. Al-Shami's sick call visit. The blood test results indicated that Wethington's Creatinine level was normal, her GFR level was below normal, and her BUN level was above normal. *See* Medical Records, Dkt. 70-1 at 25.

On November 22, 2008, it appeared that Wethington's physical condition drastically declined. On that day, Gentry observed that Wethington was very shaky and lethargic and noted that her symptoms had been getting progressively worse since taking Digoxin. Given her condition, Gentry called Dr. Ruiz who ordered him to withhold dispensing Digoxin to Wethington since her Digoxin level was above normal. Then on November 24, 2008, the next scheduled sick call, Dr. Ruiz examined Wethington, and she told him she was "[d]oing better now with stopping dig[oxin]." Afterward, he ordered that her Digoxin be discontinued as well as the results of a blood test to be faxed to him, which he ordered earlier that morning. On the morning of November 25, 2008, Dr. Ruiz received the test results from Michaelson at 9:00 a.m. and noticed that the BUN, Creatinine, and GFR levels were outside their normal range. At this point, he ordered Michaelson to take a urine sample and monitor her vital signs as well as draw more blood for further testing. However, before Michaelson could carry out these orders, Dr. Ruiz called him at 9:15 a.m. and ordered that he stop all of Wethington's diuretics and Lisinopril as well as watch for heart failure. Finally, at 9:30 a.m., Dr. Ruiz ordered Michaelson to take Wethington to the St. Clare emergency room. After reaching St. Clare, Wethington was admitted and subsequently transferred to Indiana University Medical Center. She was discharged on November 29, 2008, and her diagnosis was Digoxin toxicity, acute renal failure, hypotension, cirrhosis due to alcohol, and hemochromatosis. Additional facts are included below as needed.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476

F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## IV.  DISCUSSION

Wethington alleges that Michaelson as well as the Sheriff violated the Eighth Amendment pursuant to 42 U.S.C. § 1983 because it constituted deliberate indifference to her medical needs. Specifically, Wethington argues that Michaelson's conduct directed toward her as well as his lack of medical training exacerbated her illnesses and constituted deliberate indifference. In addition, Wethington sued the Sheriff in his official capacity arguing that his policies regarding the staffing of Montgomery County Jail's medical staff resulted in the constitutional deprivation of her rights under § 1983. Wethington further alleges additional state law claims against Michaelson, Dr. Al-Shami, and Dr. Ruiz for negligence and medical malpractice. The Court will now address each of these issues in turn.

## I.     Eighth Amendment Claims

The Eighth Amendment to the United States Constitution protects prisoners from being subjected to cruel and unusual punishment.  This Amendment imposes a duty upon the States, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002).  "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting *Estelle*, 429 U.S. at 104).

### A.     Deliberate Indifference

A claim of deliberate indifference to a serious medical need contains both an objective and a subjective element.  *Id.* at 653.  Accordingly, for a prisoner to succeed on his or her claim, he or she must demonstrate that (1) he or she suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (articulating that "the deprivation alleged must be, objectively, 'sufficiently serious,' [such as] a prison official's act or omission resulting in the denial of 'the minimal civilized measure of life's necessities….'").  In regards to the first prong, a medical condition is considered objectively serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (quoting *Greeno*, 414 F.3d at 653).  With respect to the second prong, an individual must have acted with "a sufficiently culpable state of mind." *Id.* (quoting *Farmer*,

511 U.S. at 834). Stated differently, the defendant must know of a serious risk to the prisoner's health, and he must consciously disregard that risk so as to inflict cruel and unusual punishment upon the prisoner. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (citing *Farmer*, 511 U.S. at 837-38).

### i. Chris Michaelson

Wethington asserts that Michaelson's conduct combined with the policies of the Sheriff, causing her to suffer Digoxin toxicity and acute renal failure, constituted a violation of her Eighth Amendment rights. For the purposes of this Order, the Court does not need to thoroughly analyze the first prong because the Defendants do not contest that Wethington's history of cirrhosis and hemochromatosis as well as complaints of swelling and pain present objectively serious medical conditions. *See* Defendants Br., Dkt. 72 at 14; *see also Johnson v. Frank*, 2005 WL 2249872, at *9 (E.D. Wis. Sept. 15, 2005) (determining that cirrhosis of the liver constitutes an objectively serious medical condition). As such, the Court's focus will be on whether Defendants Michaelson and Sheriff acted with deliberate indifference in their medical care of Wethington.

Wethington contends that a reasonable jury could infer deliberate indifference from Michaelson's conduct due to his failure to carry out instructions by ACH physicians as well as failing to document Wethington's deteriorating medical condition. Michaelson responds by arguing that the undisputed evidence establishes that he was not deliberately indifferent to Wethington's medical needs when he provided continuous medical care to her. Specifically, Wethington attempts to prove Michaelson acted with deliberate indifference by highlighting various incidents related to his conduct, which she argues contributed to her deteriorating medical condition.

First, Wethington claims that Michaelson exhibited deliberate indifference when he failed to monitor her blood pressure and pulse on October 28, 2008 as directed by Dr. Ruiz. *See* Defendants Resp., Dkt. 76 at 13. While there is no evidence in Wethington's medical record indicating that her blood pressure and pulse were checked on October 28, 2008, any omission in monitoring caused by Michaelson's conduct demonstrates only negligence, which does not rise to level of deliberate indifference. *See Snyder*, 444 F.3d at 585 ("Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'"); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998) ("[D]eliberate indifference is 'essentially a criminal recklessness standard, that is, ignoring a known risk' … [e]ven gross negligence is 'below the standard needed to impose constitutional liability.'") (internal citations omitted). The undisputed evidence does not demonstrate that Michaelson intentionally refused to take Wethington's blood pressure in an attempt to harm her. *See Farmer*, 511 U.S. at 835 (noting that to show deliberate indifference, "a claimant must show that officials applied force 'maliciously and sadistically for the very purpose of causing harm….'") (internal citations omitted). Moreover, the absence of monitoring Wethington's blood pressure and pulse did not contribute to her hospitalization at that time and were determined to be normal by Dr. Al-Shami a week later.

Additionally, Wethington asserts that Michaelson's failure to follow the orders of Dr. Al-Shami on November 10, 2008 constituted deliberate indifference to her serious medical condition. Specifically, Wethington argues that Michaelson did not properly administer a basic metabolic panel, which constituted a reckless disregard for her medical condition. According to Wethington's medical record, Dr. Al-Shami ordered a basic metabolic panel on November 10, 2008, and noted on the chart to be completed "This week in AM?" *See* Dkt. 70-1 at 24. Michaelson promptly complied with this order by drawing blood from Wethington on the same

afternoon and submitting the sample to St. Clare to be tested. However, Wethington contends that Dr. Al-Shami's order required Michaelson to draw blood at a later date in the week after the new medication Dr. Al-Shami had prescribed could take effect. However, in the Court's view, Michaelson's prompt action of drawing blood instead of waiting did not approach the level of "criminal recklessness," and, as such, did not constitute deliberate indifference. See *Snyder*, 444 F.3d at 586. While Michaelson may not have realized the significance of waiting to submit a blood test on Wethington, his prompt response to comply with Dr. Al-Shami's order further illustrates he was not acting with deliberate indifference. At the least, Michaelson attempted to follow the orders of Dr. Al-Shami efficiently, and the Seventh Circuit has recognized that prison officials who rely on doctor's orders do not act with deliberate indifference. *See Perkins v. Lawson*, 312 F.3d 872, 875-76 (7th Cir. 2002) ("But the fact that jail officials relied on the opinion of the doctors militates against a finding of deliberate indifference on the part of any jail personnel…."); *see also Chapman v. Keltner*, 241 F.3d 842, 846 (7th Cir. 2001).

The strongest evidence supporting Wethington's claims that Michaelson acted with a "sufficiently culpable state of mind" that rises to the level of deliberate indifference relates to events that took place between November 10 and November 21, 2008. During this time frame, Wethington's metabolic blood panel results were faxed to the jail, but Michaelson admitted that he did not inform Dr. Ruiz of the results as required by the rules. Further, it is undisputed that Wethington submitted a sick request on November 13, 2008; however, she was never seen by any ACH physician on November 17, 2008, as required by the jail rules. There is also evidence to suggest that Wethington's medical condition began to deteriorate between November 17 and November 21, 2008 based on affidavits by fellow inmates. *See* Dkt. 77-8.

However, the inmates' statements alone are not enough to create a genuine issue of material fact when they do not supply specific concrete facts as to Wethington's reaction to her medication, when Michaelson was working at the jail on November 19 and 20, 2008. *See Fast Tek Group, LLC v. Plastech Engineered Prods., Inc.*, 2006 WL 2228960, at *7 (S.D. Ind. Aug. 3, 2006) (granting plaintiff's motion for summary judgment when defendant's affidavit in opposition was vague and conclusory). Moreover, Michaelson stated that when he dispensed medication to Wethington on November 19 and 20, 2008, he did not notice anything unusual about her condition. *See* Dkt. 73-1 at ¶ 48. As discussed earlier, the fact that an ACH physician did not see Wethington on November 17, 2008 may rise to the level of negligence, but it does not constitute deliberate indifference, especially when Michaelson and Gentry continued to update Dr. Ruiz of Wethington's condition after November 20, 2008. Therefore, the Court concludes that Michaelson's conduct did not constitute deliberate indifference. Accordingly, Michaelson did not violate the Plaintiff's Eighth Amendment rights.[3]

### ii. Dr. Al-Shami, Dr. Ruiz, and ACH

In Wethington's amended complaint, she alleged that Dr. Al-Shami and Dr. Ruiz acted with deliberate indifference to her serious medical needs in violation of the Eighth Amendment. She further alleged that ACH adopted a policy that also constituted deliberate indifference to her serious medical needs. However, in Wethington's response brief, she voluntarily dismissed her Eighth Amendment claims against Dr. Al-Shami, Dr. Ruiz, and ACH. *See* Plaintiff's Resp., Dkt. 76 at 1. Therefore, the Court concludes that Dr. Al-Shami, Dr. Ruiz, and ACH are not liable to Wethington for violating the Eighth Amendment.

---

[3] Michaelson also argues that he is entitled to qualified immunity. The Court concludes that because there was no constitutional violation of Wethington's Eighth Amendment rights, it is unnecessary to consider whether Michaelson was entitled to qualified immunity. *Kraushaar v. Flanigan*, 45 F.3d 1040, 1049 n.4 (7th Cir. 1995).

### B.    Policy of the Sheriff of Montgomery County

Wethington also sued the Sheriff, in his official capacity, arguing that he is liable under § 1983 because his medical staffing policy constituted deliberate indifference.   Specifically, Wethington contends that the Sheriff is liable because he has a policy or custom of staffing the jail's medical team with medical personnel other than nurses or doctors, which led to Wethington's deteriorating medical condition.  *See Monell v. Dep't of Soc. Servs. Of New York*, 436 U.S. 658, 690-91 (1978).   In order to prevail on an official capacity suit against Sheriff pursuant to § 1983, Wethington must prove that some custom, policy, or practice caused her injury.   *Perkins*, 312 F.3d at 875.   To accomplish this, Wethington must show that her constitutional rights were deprived by (1) an express policy, (2) a widespread practice that is well-settled enough to amount to a practice; or (3) an act by an individual with policymaking authority that caused her injury.  *Grieveson v. Anderson*, 538 F.3d 763, 773 (7th Cir. 2008).

The Sheriff argues that he cannot be held liable to Wethington pursuant to § 1983 based on an unconstitutional policy or practice because Wethington suffered no constitutional injury by the Sherriff or the physicians.  *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (noting that the City of Milwaukee could not be held liable for failing to train its officers to prevent a constitutional violation under the reasoning of *Monell,* when there has been no violation of the plaintiff's constitutional rights); *see also Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 699 (1986) ("'[I]f a person has suffered no constitutional injury at the hands of the individual police officer[s], the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.'").  The Court is persuaded by this argument.

Like in *Jenkins*, Wethington has not demonstrated to the Court that she suffered a constitutional injury due to the conduct exhibited by Michaelson.  She also has not shown any constitutional violation attributable to Dr. Al-Shami, Dr. Ruiz, or ACH because she voluntarily dismissed the Eighth Amendment claim against them.  Because Wethington cannot establish a constitutional injury from the conduct of the prison officials or the ACH physicians, her claim asserting municipal liability under § 1983 cannot stand.  *See Phillips*, 123 F.3d at 597 ("Neither the City nor the police officers' supervisor can be held liable on…a municipal policy theory absent a finding that the individual police officers are liable on the underlying substantive claim.").  Therefore, the Court concludes that Sheriff is not liable for any constitutional violation pursuant to § 1983.

## II.       State Law Claims

After resolving all of the federal claims in this matter, all that remains in this case are Wethington's state law claims against Michaelson, Dr. Al-Shami, and Dr. Ruiz.  Specifically, Wethington argues that Michaelson was negligent in his care of Wethington during her incarceration at Montgomery County Jail.  Michaelson is a medical officer at Montgomery County Jail and, as such, he is a governmental employee employed under the Sheriff.  Under Indiana law, tort claims against governmental entities are controlled by the ITCA.  Ind. Code § 34-13-3-1.  Pursuant to Indiana Code § 34-13-3-5(c), "[a] lawsuit filed against an employee personally must allege that an act or omission of the employee that causes a lost is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally."  Ind. Code § 34-13-3-5(c).

Here, even after drawing all facts and inferences in favor of Wethington, she has not established that there is a genuine issue of material fact that Michaelson acted in a manner that

would subject him to liability under the ITCA.  Wethington did not provide sufficient facts under her first claim contending that Michaelson acted criminally, maliciously, willfully and wantonly, clearly outside the scope of the employment, or in a calculated way to benefit himself personally. Ind. Code § 34-13-3-5(b); *see also Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003). Therefore, Wethington's state law claim against Michaelson falters.[4]

Wethington's remaining state law claims allege Dr. Al-Shami and Dr. Ruiz are liable under Indiana law for medical malpractice.  In order for Wethington to succeed on her medical malpractice claims she must prove that (1) a duty was owed to her by Dr. Al-Shami and Dr. Ruiz; (2) Dr. Al-Shami and Dr. Ruiz breached this duty by permitting their conduct to fall below the set standard of care; and (3) she suffered an injury proximately caused by Dr. Al-Shami and Dr. Ruiz's breach of duty.  *Stumph v. Foster*, 524 N.E.2d 812, 814 (Ind. App. Ct. 1988).  In addition, expert testimony is generally necessary in establishing that a professional's performance fell below the requisite standard of care in a medical malpractice case.  *Id.; see Narducci v. Tedrow*, 736 N.E.2d 1288, 1293 (Ind. App. Ct. 2000) (quoting *Malooley v. McIntyre*, 597 N.E.2d 314, 319 (Ind. App. Ct. 1992) ("[E]xpert testimony is required 'when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological make-up, and pathology.'").  However, expert testimony is only required when the issue of determining the standard of care is beyond the realm of the lay person.  *Emig v. Physicians Physical Therapy Serv.*, 432 N.E.2d 52, 53 (Ind. App. Ct. 1982).

---

[4] Wethington also argues that the Defendants' actions violated her rights under the Indiana Constitution.  *See* Amend. Compl., Dkt. 26 at ¶ 16.  However, violations of state law, including the Indiana Constitution, are not actionable under § 1983.  *Brooks v. Wilson*, 2007 WL 2344906, *2 (N.D. Ind. Aug. 14, 2007).  In addition, the Court declines to find that a private right of action exists for violations of the Indiana Constitution in this particular case. *See Greater Indianapolis Chapter of N.A.A.C.P. v. Ballard*, 741 F. Supp. 2d 925, 934 (S.D. Ind. 2010) (citing cases) ("[T]he judges of this District have refused to recognize implied rights of action under the Indiana Constitution.").

Here, the Court concludes that the determination of whether the prescribing of ACE inhibitor and Digoxin to Wethington by Dr. Al-Shami and Dr. Ruiz given her medical history constitutes negligence is beyond the realm of a lay person's understanding. As such, Wethington has the burden to produce expert testimony on this issue. Because Wethington has failed to produce admissible expert testimony articulating whether Dr. Al-Shami and Dr. Ruiz's performance fell below the requisite standard of care, she has not demonstrated the existence of a genuine issue of material fact as it relates to her medical malpractice claims. At most, Wethington's affidavit and her sister's affidavit contain statements that opine upon Wethington's medical condition; however, these statements do not create genuine issues of fact because they are unqualified medical opinions by lay persons that must be disregarded. *See* Fed. R. Evid. 702. Therefore, because Wethington has not presented admissible expert testimony showing that Dr. Al-Shami and Dr. Ruiz's medical treatment fell below the requisite standard of care, Wethington's medical malpractice claims fail as a matter of law.

## V.   CONCLUSION

For the reasons set forth above, Defendants Sheriff of Montgomery County and Michaelson's Motion for Summary Judgment (Dkt. 71) is **GRANTED in its entirety,** and Defendants Dr. Al-Shami, Dr. Ruiz, and Advanced Correctional Healthcare, Inc.'s Motion for Summary Judgment (Dkt. 68) is **GRANTED in its entirety.** In addition, Motion by All Defendants to Exclude Plaintiff's Experts (Dkt. 86) is **GRANTED.** This case is dismissed, and a separate judgment shall accompany this Order.

SO ORDERED:

Date: _12/21/2011_

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

20

DISTRIBUTION:

James E. Ayers
WERNLE RISTINE & AYERS
ayersj@wralaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

James F. Bleeke
BLEEKE DILLON CRANDALL, P.C.
jim@bleekedilloncrandall.com

Wayne E. Uhl
STEPHENSON MOROW & SEMLER
wuhl@stephlaw.com